**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Sandra K. Gongwer,** | ) | **CASE NO. 1:13 CV 2750** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Samaritan Regional Health System,** | ) | **Memorandum of Opinion and Order** |
| **et al.,** | ) | |
| **Defendants.** | ) | |

**Introduction**

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc. 18). This case arises out of plaintiff's former employment with defendants. For the following reasons, the motion is GRANTED as to Count Three and the remaining state law claims are remanded to the Ashland County Court of Common Pleas.

**Facts**

Plaintiff Sandra Gongwer filed her Complaint against defendants Samaritan Regional Health System (Samaritan), Lisa Bushong, Alice Legg, Jeanette Wagner, and John and Jane Does in the Ashland County Court of Common Pleas. The matter was removed to this Court on

1

the basis of federal question jurisdiction arising from the sole federal claim asserted herein, i.e., the Family Medical Leave Act (FMLA) claim asserted in Count Three.

Samaritan is a non-profit acute care facility in Ashland, Ohio. Plaintiff began working for Samaritan in 2001 as a Unit Assistant in the emergency department (ED). Legg is Samaritan's Vice President of Resource Development. Bushong is Director of the ED and was plaintiff's direct supervisor from October 2009 until plaintiff's termination. Wagner is defendant's Employment Manager whose duties include processing requests for FMLA leave.

Plaintiff took FMLA leave in 2004, 2005, and 2007. In February 2008, plaintiff suffered a work related injury when she fell. The return to work authorization shows that plaintiff returned to work without restrictions on April 7, 2008. Around November 2008, plaintiff requested FMLA leave. She avers that the request was to "deal with the unrelenting pain" associated with the back injury she suffered as a result of the February 2008 fall. Samaritan approved her request from October 24, 2008 through January 15, 2009. Plaintiff's treating physician returned her to work as of January 8, 2009 with the restriction of no lifting over 20 pounds. The physician further indicated "new job description unit secretary." Samaritan had conferred with plaintiff's physician in order to return plaintiff to work in a position that would permit the lifting restriction. The Unit Secretary "provides clerical support and is the primary receptionist for the patient care unit. [It] is a highly visible position on the unit and has frequent contact with patients, visitors, physicians and fellow employees." The position's essential job functions included "regular and predictable attendance." At deposition, plaintiff agreed that when she accepted the new position, she could perform the job duties and requirements. Plaintiff considered the Unit Secretary position to be a demotion because it had less patient involvement.

It also involved a decrease in pay.

According to plaintiff, she requested FMLA leave on August 3, 2009 to care for her husband who had been paralyzed in an earlier accident. The request was approved but, at some point, plaintiff was notified that she had exhausted her FMLA leave and Samaritan would provide her with a regular medical leave of absence. As such, plaintiff acknowledged that by letter of August 24, 2009, Samaritan approved plaintiff's leave request for 80 hours from August 3, 2009 through August 18, 2009.

On August 31, 2009, plaintiff's husband shot himself and was critically injured. Because plaintiff's leave had expired, her co-workers donated Paid Time Off (PTO). Plaintiff returned to work in October 2009 in her same position.

When plaintiff returned to work, Bushong was her new supervisor. According to plaintiff, under Bushong her work environment changed drastically with Bushong humiliating her, yelling at her, and picking on her to try to get plaintiff to quit. Upon her return, plaintiff asked Bushong for a part-time position. There was no part-time position available and plaintiff's request was denied.

According to Legg, and as evidenced by the FMLA form, Samaritan again approved plaintiff's FMLA request for leave beginning on January 12, 2010. Plaintiff provided a doctor's return to work approval of April 7, 2010. It was indicated that plaintiff had no restrictions.

Legg avers that Samaritan restructured the ED in 2010 which involved the creation of a new ED Receptionist position and elimination of the receptionist duties from the responsibility of the Unit Secretary. The ED Receptionist was solely responsible for covering the front window of the ED located in the triage area. The ED Receptionist earned a lower wage than the Unit

3

Secretary because the position performed fewer job responsibilities. Samaritan "came to understand that plaintiff no longer wanted to perform the duties of Unit Secretary," so it changed plaintiff's position to ED Receptionist as of September 5, 2010. Samaritan's letter to plaintiff confirming the position change states, "As a result of your request to no longer perform all of the essential functions of a Unit Secretary in the Emergency Department your position has been restructured to a Receptionist."

On September 13, 2010, plaintiff suffered another injury at work when she fell on a wet floor. Plaintiff avers that she broke her neck and that her neck and back needed to be restructured, and that when she sought accommodations for these injuries, Bushong belittled her. Plaintiff acknowledged at deposition that she was returned to work with restrictions on September 16, 2010. Samaritan then created a temporary job change from ED Receptionist to ED Office Clerk, effective October 22, 2010, to accommodate plaintiff's medical restrictions related to lifting and bending. Plaintiff worked in that temporary position, with the same pay, until her restrictions were lifted and she returned to the ED Receptionist position.

Plaintiff requested another FMLA leave in October 2010, to try to seek surgery for her back and neck. The request was denied because plaintiff had exhausted her leave. She requested FMLA leave again in January 2011, but that request was denied because plaintiff was ineligible based on the amount of her hours worked. Plaintiff was then granted FMLA leave beginning March 17, 2011. Plaintiff's physician released her to return to work without restrictions on May 23, 2011. On August 22, 2011, plaintiff requested FMLA leave to cover the period of August 10, 2011. The request was denied because she did not have a sufficient number of hours.

According to plaintiff, on October 26, 2011, her husband and son arrived at the ED while

4

plaintiff was working her regular shift as Receptionist. Plaintiff believed her husband was suffering a panic attack and she brought him behind the desk with her into the triage area. Plaintiff continued to operate the triage desk while her husband was sitting behind her. According to Legg, she received a complaint that plaintiff had allowed her husband into the enclosed portion of the triage area while she was obtaining protected health information (PHI) from patients. Legg led an investigation into the complaint and determined that plaintiff had allowed her husband to be with her in the triage area when PHI was being provided by one or more patients to plaintiff. Based on Legg's understanding of Samaritan's policies regarding confidential and private patient information, Legg concluded that plaintiff violated Samaritan's HIPPA policies prohibiting disclosure of patient information. Legg determined that plaintiff's violation constituted a severe infraction and she made the decision to terminate plaintiff. Plaintiff was terminated as of November 16, 2011 for her breach of the HIPPA policies.

Plaintiff's Complaint sets forth six claims. Count One alleges disability discrimination under Ohio law. Count Two alleges associational disability discrimination under Ohio law. Count Three alleges violation of the FMLA. Count Four alleges negligent supervision and training. Count Five alleges intentional infliction of emotional distress. Count Six alleges invasion of privacy.

This matter is now before the Court upon defendants's Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376,

378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant

summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### Discussion

As there is no diversity of citizenship, the Court will address the sole federal claim first.

### FMLA

The Complaint alleges that defendants interfered with plaintiff's rights under the FMLA, and discharged her in retaliation for seeking and taking FMLA leave.

### (a) interference

Initially, defendants assert that this claim is barred by the two year statute of limitations for FMLA claims given that plaintiff last sought and was denied FMLA leave in August 2011 and she did not file this Complaint until November 2013. A two year statute of limitations applies unless defendants' violation of the statute is willful. *Ricco v. Potter,* 377 F.3d 599 (6th Cir. 2004) (citing 29 U.S.C. § 2617(c)). "An employer commits a willful violation of the FMLA when it acts with knowledge that its conduct is prohibited by the FMLA or with reckless disregard of the FMLA's requirements." *Id.*

Defendants point out that Samaritan granted FMLA leave to plaintiff in 2004, 2005, 2007, 2008, 2010, and 2011, thereby refuting any claim that it acted willfully. Plaintiff contends that defendants' actions were willful. Plaintiff points to her deposition testimony that Bushong told her that "you know, none of this is my problem and sooner or later you're going to have to choose which is more important, the job or your husband." (pltf. depo. 165) But, plaintiff did not recall when Bushong made this statement and plaintiff testified that the statement was made "in just talking about the hours or they gave me, ah, a deadline I believe to get my attendance cleared up from January of 2011, like I was on a probation thing where all my points had to fall

7

off January of 2012, I believe." (*Id.* 165-166) The Court does not find this to be evidence of a willful violation of the FMLA. In the absence of willfulness, the two year statute of limitations applies and bars the interference claim since plaintiff last sought FMLA leave in August 2011- more than two years prior to the filing of the November 15, 2013 Complaint.

Even assuming the FMLA interference claim was timely, plaintiff fails to establish a prima facie case. Plaintiff must show: 1) she was an eligible employee, 2) the defendant was an employer as defined under the FMLA, 3) the employee was entitled to leave under the FMLA, 4) the employee gave the employer notice of her intention to take leave, and 5) the employer denied the employee FMLA benefits to which she was entitled. *Donald v. Sybra, Inc.,* 667 F.3d 757 (6th Cir. 2012) (citations omitted). Defendants assert that plaintiff cannot satisfy the first, third, or fifth elements because she cannot prove that she was entitled to the benefits. Plaintiff does not address her prima facie burden. The Court agrees with defendants that she has not established the prima facie case.

It is not disputed that to be eligible for protection under the FMLA, plaintiff must have worked for the employer at least 1,250 hours during the 12 month period preceding the date upon which the leave began. Assuming the three year statute of limitations applies, the Court looks to denials of FMLA leave requests from November 2010 through November 2013. This Court agrees with defendants that plaintiff's requests for FMLA leave in January 2011 and August 2011 were denied because plaintiff had not worked the requisite number of hours, and plaintiff's request in March 2011 was granted. Plaintiff testified:

Q. You requested FMLA leave on January 28, 2011; is that correct?

A. Correct.

> Q. And you were denied that leave because you hadn't worked enough hours in the 12 months preceding that leave request, correct?
>
> A. I don't recall.
>
> Q. Do you recall receiving Notice that the, that your request was denied?
>
> A. No.
>
> Q. Do you recall ever talking to anyone about the leave request?
>
> A. I don't recall.
>
> Q. Do you recall taking any time off?
>
> A. No.
>
> Q. In January 2011?
>
> A. I don't recall.

(pltf. depo. 109-110). Plaintiff's affidavit testimony shows that the January 2011 FMLA request was denied due to her ineligibility. (pltf. aff. ¶55) Plaintiff testified that her request for FMLA leave starting on March 17, 2011 through a tentative date of May 1, 2011 was approved, she requested additional time through May 12, 2011 which was also approved, and she was released to return to work without restrictions on May 23, 2011. (*Id.* 110-114) Plaintiff also testified that she requested FMLA leave dated August 22, 2011, but that she was notified that she did not have a sufficient number of hours and, consequently, the request was denied. (*Id.* 116) Plaintiff does not present evidence that she was inappropriately denied FMLA leave in January or August 2011. Therefore, plaintiff fails to establish that she was denied FMLA benefits to which she was

9

entitled and her interference claim fails.[1]

    **(b) retaliation**

This claim alleges that defendants discharged plaintiff for seeking and taking FMLA leave. (Compl. ¶ 66)[2]

Initially, plaintiff argues there is direct evidence of FMLA retaliation based on Bushong's statement that plaintiff would have to choose between her job and her husband. This is not direct evidence for several reasons. First, as discussed above, plaintiff's own deposition testimony shows that this alleged conversation did not take place when discussing FMLA leave. Second, Legg was the sole decisionmaker, and not Bushong. (Legg aff.)  Third, the statement requires an inference that Bushong is referring to plaintiff's FMLA usage and her termination.

A plaintiff may establish a prima facie case of FMLA retaliation "by showing that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity." *Murphy v. Ohio State University*, 549 Fed.Appx. 315 (6th Cir. 2013) (citations omitted) "If the plaintiff carries her burden of proof, the burden shifts to the employer to offer evidence of

---

[1]  Plaintiff avers that by November 2012, she was eligible for additional FMLA leave and intended to use it but was unable to do so because she was terminated. (plf. aff. ¶ 83) This does not show, at a minimum, that plaintiff gave notice of her intention to take FMLA leave to which she was entitled but was denied.

[2]  Although her Complaint alleges that plaintiff's discharge was the retaliatory act, plaintiff seems to assert in her brief that when she was not returned to the same or equivalent job with equivalent pay when her FMLA leave was exhausted, this act amounted to retaliation.  But, this occurred in January 2009, clearly outside either the two or three year statute of limitations.

a legitimate, non-discriminatory reason for the adverse employment action. If the employer succeeds, the burden shifts back to the plaintiff to show that the employer's proffered reason is a pretext for unlawful discrimination." *Id*. At the pretext stage, the Court considers whether the plaintiff "has adduced evidence which would enable a factfinder to conclude that the defendant's stated reason for terminating her is not the true reason and is simply a pretext for unlawful retaliation. *Travers v. Cellco Partnership,* - Fed. Appx.- , 2014 WL 4397633 (6th Cir. Sept. 8, 2014) (addressing an FMLA retaliation claim). "The plaintiff must always produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him." *Id.* A plaintiff can show pretext by showing that the asserted reason for the action had no basis in fact, did not actually motivate defendant's action, or was insufficient to motivate the action. *Id.*

Plaintiff does not address her burden of satisfying the prima facie case of FMLA retaliation. The Court finds that plaintiff does not establish a prima facie case. In particular, plaintiff cannot show a causal connection between her termination and utilizing the FMLA. In an FMLA retaliation claim, an employer initiates an adverse employment action against an employee for exercising his right to take FMLA leave. *Travers v. Cellco Partnership,* - Fed.Appx. -, 2014 WL 4397633 (6th Cir. Sept. 8, 2014). As discussed above, plaintiff has not demonstrated that she was denied FMLA to which she was entitled and she was granted FMLA leave on all occasions when she was entitled to it. Plaintiff asserts in her brief that there is "some evidence" that she gave notice in August 2011 that she would need FMLA leave in the future, but that she was prevented from using the accruing FMLA leave by her termination. But, plaintiff points to no evidence that she gave such notice. In fact, plaintiff's affidavit testimony is

11

that "[b]y November of 2011, I would have been eligible for additional FMLA leave, and intended to use it, but was unable to because I was terminated." This does not show that plaintiff engaged in the protected activity of requesting FMLA leave to which she was then entitled. Plaintiff presents no evidence that defendants were resentful of granting the FMLA leaves and initiated her termination in retaliation.

The Court need not proceed to pretext. But, assuming plaintiff establishes a prima facie case, she does not demonstrate pretext. Plaintiff does not address pretext in the context of her FMLA claim. Even if the Court were to apply plaintiff's argument with regard to her Ohio disability discrimination claims, plaintiff fails to show that the reasons given for her termination were actually a pretext for exercising her FMLA rights.

As discussed above, plaintiff was terminated for her breach of the HIPPA policies. Plaintiff attempts to demonstrate pretext under the three showings enumerated above. Plaintiff asserts that this proffered reason had no basis in fact. Plaintiff contends that contrary to defendants' assertions, she did not admit that permitting her husband to sit with her in the triage area was a violation of Samaritan's HIPPA policy. Plaintiff's termination notice states in part,

> The definition of a breach of HIPPA includes '... the unauthorized acquisition, access, use, or disclosure of PHI which compromises the security or privacy of such information, except where an [un]authorized person to whom such information is disclosed would not reasonably have been able to retain such information.'

Plaintiff contends that it was a subjective policy. Plaintiff asserts that her husband would not have been able to retain any of the private information he may have overheard. At deposition, she testified that "mentally he doesn't remember things." (pltf. depo. 121) But, plaintiff does not dispute the facts underlying the reason for her termination. Plaintiff only disagrees that her actions amounted to a terminable offense. Furthermore, when asked at

12

deposition why she refused to sign her termination notice, she stated that she disagreed with it because "I felt that they didn't know the whole reason, I felt they thought my husband was just there, just to be there..." (pltf. depo. 131) Nonetheless, this Court recognizes that the

> Sixth Circuit has adopted the 'honest belief rule' with regard to an employer's proffered reason for discharging an employee. Under the honest belief rule, so long as the employer honestly believed in the proffered [nondiscriminatory] reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken or incorrect. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir.1998). The employer's decision-making process need not be optimal, nor leave no stone unturned; '[r]ather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.' *Id.* at 807. To determine whether the employer had an honest belief in the proffered basis for the adverse employment action, a court should ask whether the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.' *Id*.

*Weaver v. City of Twinsburg, Ohio,* --- Fed.Appx. ----, 2014 WL 4634186 (6th Cir. September 16, 2014) ). To overcome the employer's reliance on the honest belief rule, the employee "must allege more than a dispute over the facts upon which the discharge was based. [She] must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-[retaliatory] reason for the adverse employment action." *Braithwaite v. Timken Co.,* 258 F.3d 488 (6th Cir. 2001).

Defendants have presented evidence that a reasonably thorough investigation was conducted prior to the decision to terminate plaintiff. The incident occurred on October 26, 2011 and the notice of termination was issued on November 16, 2011. Wagner testified that she interviewed the employee who had observed plaintiff's alleged violation, and that Bushong and security personnel reviewed security video footage of the incident. (Wagner depo. 56, 60) Legg had a meeting with plaintiff to discuss plaintiff's version of the events. (Legg depo. 88-89) The termination notice states that plaintiff's position as receptionist "is responsible for discreetly

dealing with sensitive and confidential patient information." It further states that on the subject date,

> Per the hospital security cameras, Sandy took her husband with her into the patient triage area where he sat next to her for approximately 1 hour and 20 minutes. During this time, Sandy was clocked in and greeted and started the intake process for 4 separate patients while her husband sat next to her. The House Supervisor walked over to the Emergency Department lobby and found Sandy's husband sitting with her in the triage area. The Supervisor requested to speak to Sandy and told her that her husband is not permitted to be in the triage area. Sandy had her husband move to the Emergency Department lobby and shortly after that timeframe he left the building. The House Supervisor then followed up with Sandy to make sure her husband had left the hospital property and told Sandy she never wanted to hear of this type of situation again.

The notice states that plaintiff had been informed of her "responsibility to protect patient health information" and that as a result of the investigation it was concluded that she had violated HIPPA.

Plaintiff argues that "there is some evidence that [defendants] failed to adequately investigate Sandy's alleged conduct, but rather quickly jumped to the conclusion to fire her." (Doc. 21 at 33) But, plaintiff does not support this statement by any evidence.

Lastly, plaintiff avers that during the meeting with Legg when plaintiff was told that she violated HIPPA, plaintiff "explained that this was a common occurrence in the ER and no one else had been disciplined." Therefore, plaintiff did not dispute the underlying facts but contended that others violated HIPPA but were not disciplined.

Plaintiff has not demonstrated that the reason for her dismissal had no basis in fact.

Next, plaintiff argues that the HIPPA violation did not really motivate her dismissal. Plaintiff asserts that there is some evidence that defendants did not adequately investigate the alleged conduct. As discussed above, there is no basis to support this assertion. Plaintiff also contends that there is some evidence that Samaritan was in financial difficulty and concerned

14

about the rising cost of plaintiff's ongoing injuries and her husband's medical expenses. Plaintiff relies on her affidavit wherein she avers that Wagner "told me that I should be concerned about the amount of my husband's medical expenses because 'we are self-funded,' and that my husband's bills were close to 1 million dollars and that my coverage would be dropped." However, Legg, not Wagner, made the decision to terminate plaintiff. Even so, this statement does not show that FMLA retaliation was more likely the reason for the termination than plaintiff's HIPPA violation.

Last, plaintiff asserts that the proffered reason was insufficient to motivate the termination. Plaintiff argues that other employees engaged in similar conduct and were not disciplined. But, plaintiff does not identify individuals who had sought FMLA leave and were treated differently. Plaintiff avers, "I know of two other ER employees who violated HIPPA who were not terminated, one published patient information on Facebook, the other was talking on her cell phone while treating a patient." But, plaintiff provides no evidence that Legg had knowledge of the alleged comparators and treated them differently. Similarly, plaintiff submits the affidavit of Daniel Frydrychowski who avers that he also worked as a Receptionist in the ED and that "[i]t was a common occurrence in the Samaritan ER to have family members of ER employees visit in the ER and stay for extended periods of time at locations where private patient information could be overheard." He also avers that when he worked there, he had family members visit him while he was working as a Receptionist at the triage window and that he was never disciplined for it. (Frydrychowski aff.) Again, there is no evidence that Legg was aware of these alleged incidents and, in fact, she has averred that at the time she made the decision to terminate plaintiff, she had no knowledge of any other employee allowing his family member to

be present in the triage area when PHI was exchanged. Legg also avers that she has terminated two other employees for violating HIPPA and Samaritan's policies, one prior to plaintiff's termination and one subsequent to it. In fact, plaintiff acknowledged at deposition that she had been aware prior to her termination that people had been terminated for HIPPA violations although she did not know the specifics.  (pltf. depo. 132)

Finally, it should be noted that plaintiff acknowledges that it was her supervisor, Tammy Norris, who came to plaintiff and told her that her husband should not be sitting with her. (Doc. 21 at 19; pltf. depo. 127) This employee reported the incident to defendants. There is no evidence that this employee had knowledge of plaintiff's exercise of her FMLA rights or harbored animus because of such.

Plaintiff fails to show pretext.

For these reasons, the FMLA claim fails.  Having dismissed the sole federal claim presented to this Court upon removal from state court, the Court hereby remands the remaining state law claims to the Ashland County Court of Common Pleas. *See Garrett v. Johnson,* 2014 WL 2006776 (E.D.Tenn. 2014) ("When all federal claims have been dismissed, the preferred disposition of state law claims is dismissal, or, where a case has come into federal court on removal, remand to state court."); *Nollner v. Southern Baptist Convention, Inc*., 852 F.Supp.2d 986 (M.D.Tenn.2012) (Where the federal claim upon which removal was premised is dismissed, the court should decline to exercise supplemental jurisdiction over the pendent state law claims and remand the action to state court.)

**Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment is granted as to

Count Three and the remaining state law claims are remanded to the Ashland County Court of Common Pleas.

        IT IS SO ORDERED.


                              /s/ Patricia A. Gaughan
                             PATRICIA A. GAUGHAN
                             United States District Judge

Dated: 11/24/14